# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| **SECURITIES & EXCHANGE COMMISSION,** ) | |
| ) | |
| **Plaintiff,** ) | **Civil Action No.:  4:19-cv-1774** |
| ) | |
| **v.** ) | |
| ) | |
| **ANDREW I. FARMER,** ) | |
| **EDDIE D. AUSTIN, JR.,** ) | |
| **SCOTT R. SIECK,** ) | |
| **CAROLYN P. AUSTIN** ) | |
| **and** ) | |
| **JOHN D. BROTHERTON,** ) | |
| ) | |
| **Defendants.** ) | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission (the "Commission") alleges:

## NATURE OF THE ACTION

1.        Between at least May 2011 and May 2017, Defendants, acting as a Group (hereinafter the "Group") planned and perpetrated a securities fraud scheme involving the successive, serial "pump-and-dump" of multiple different penny stocks quoted on U.S. markets. The Group's leadership included Defendants Farmer, Eddie Austin, Sieck, and, at various times, Brotherton, with Defendant Carolyn Austin also aware of the Group's activities and sharing in its illicit proceeds.  The Group coordinated its illegal pump-and-dump scheme through frequent meetings in, among other locations, a windowless conference room in Houston (to which it referred as its "war room"), as well as through encrypted communications.  Between April 2014 and May 2017 alone, the Group's scheme included at least five different penny stock issuers (hereinafter the "Issuers") and yielded at least $15 million in ill-gotten gains.

2.      A "pump-and-dump" is a species of securities fraud involving "penny stocks," which are stocks publicly quoted on U.S. over-the-counter markets and having share prices ranging from just pennies to as much as five dollars.  A "pump-and-dump" typically involves at least four major integrated, fraudulent phases, often referred to as "get the stock," "prime the pump," "pump the stock," and "dump the stock."  In the first stage, the perpetrators secretly acquire all, or virtually all, of a penny stock issuer's freely tradeable stock, typically allocating the stock's nominal ownership across an array of *alter ego* front companies.  Next, they orchestrate coordinated trading to create the false appearance of market interest in the stock and to set artificially elevated share prices.  Next, they orchestrate materially misleading promotional campaigns urging investors to buy the stock based on purported prospects of imminent gains. Finally, they exploit the share price and trading volume rises their actions have created by unloading their stock on unsuspecting investors, who are typically left holding worthless paper after their promotional campaigns end.  A pump-and-dump typically involves violations of both the antifraud and the securities registration provisions of the federal securities laws.

3.      To implement its own pump-and-dump scheme, the Group followed this general pattern, but added additional features designed both to enhance its scheme's profitability and to frustrate its detection.  In its scheme's "get the stock" phase, the Group first obtained secret control over all, or virtually all, of each of the Issuers' outstanding stock, and installed a figurehead CEO, whose actions it could direct, at each Issuer.  The Group then proceeded fraudulently to obtain, and to deposit with its various foreign and domestic *alter ego* entities, purportedly free-trading shares of each Issuer's stock.

4.       The Group next "primed the pump" by orchestrating "matched" or otherwise coordinated trades (in which both buyer and seller were secretly in league, working together to create the illusion of market demand and to set artificially elevated prices) in each Issuer's stock.

5.       In order to then "pump the stock" the Group secretly arranged for and funded massive, materially misleading promotional campaigns.  These campaigns primarily featured email blasts and online "click ads," and the Group timed these campaigns to coincide with press releases it caused each Issuer to disseminate.  In preparation for this phase of its scheme, the Group had met and formulated materially misleading "story arcs" for each Issuer.  Each "story arc" set forth the Issuer's supposed line of business and a detailed timeline for when the Issuer would disseminate press releases and what those releases would say.  The goal of each "story arc" was to induce investors to purchase the Issuer's stock.  When carrying out its promotional campaigns for each Issuer, the Group followed these "story arcs."

6.       After the Group's coordinated and matched trading (priming) and promotional campaigns (pumping) caused the price of each stock to rise, the Group dumped its stock into the market.  It then distributed the ill-gotten gains among the Group's leaders using complex and secretive means designed to avoid detection.

7.       From Spring 2014 to Spring 2017, the Issuers whose stocks were the subject of the Group's pump-and-dump schemes included:

     a.   Puget Technologies, Inc., whose ticker symbol was PUGE (hereinafter "Puget");

     b.   Gankit Corporation, whose ticker symbol was GANK (hereinafter "Gankit");

     c.   Nhale, Inc., whose ticker symbol was NHLE (hereinafter "Nhale");

    d.  Horizon Energy Corp., whose ticker symbol was HORI (hereinafter "Horizon"); and

    e.  Valmie Resources, Inc., whose ticker symbol was VMRI (hereinafter "Valmie").

8.    By the conduct described herein, Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton violated the antifraud provisions of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], and the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §§ 240.10b-5], as well as the registration provisions of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].  Defendants will continue to violate the aforementioned provisions unless restrained or enjoined by this Court.  Accordingly, the Commission seeks injunctive relief, disgorgement of ill-gotten gains, prejudgment interest, civil penalties, and other appropriate and necessary equitable and ancillary relief.

## JURISDICTION AND VENUE

9.    This Court has jurisdiction over this action pursuant to Securities Act Sections 20(d)(1) and 22(a) [15 U.S.C. §§ 77t(d)(1) and 77v(a)] and Exchange Act Sections 21(d), 21(e), 21A, and 27 [15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa].

10.    Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce, of the mails or of the facilities of a national securities exchange, in connection with the acts, practices, and courses of business alleged herein, certain of which occurred within the Southern District of Texas.

11.    Venue in this district is proper under Section 22(a) of the Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because certain of

the acts, practices, transactions, and courses of business constituting the violations alleged herein occurred within the Southern District of Texas.

## DEFENDANTS

12.     **Andrew Ian Farmer** ("Farmer"), age 40, is a U.S. citizen residing in Houston, Texas.  As detailed below, Farmer helped oversee and coordinate virtually every aspect of the pump-and-dump scheme detailed herein.  On February 1, 2019, Farmer pleaded guilty to one count of conspiracy to commit wire fraud and securities fraud in violation of 18 U.S.C. § 371 and one count of securities fraud in violation of 15 U.S.C. §§ 77q(a) and 77x, before this court in *United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.).

13.     **Eddie Douglas Austin, Jr.** ("Eddie Austin"), age 68, is a U.S. citizen currently residing in Houston, Texas.  Eddie Austin is married to Defendant Carolyn Austin.  Eddie Austin is a former stockbroker (who was sanctioned by the New York Stock Exchange in 1986) and a former lawyer (who was permanently barred, by consent, from practicing law "in Louisiana or any other jurisdiction" in 2011 (*see In re Austin*, 60 So.3d 604 (La. 2011)), and from appearing or practicing before the Commission in 2013 (*see Matter of Eddie Douglas Austin Jr., Esq.*, Exchange Act Rel. No. 34-69326/April 5, 2013).  In January 2013, he consented to a permanent antifraud injunction and penny stock bar in settlement of an SEC penny stock fraud case.  *See SEC v. Sunrise Solar Corporation et al.*, Civil Action No. 5:12-CV-918 (W.D. Tex., filed Sept. 28, 2012).  His role in the scheme included participating in "war room" strategy meetings, helping formulate "story arcs" for the various Issuers, and funding various expenditures he knew to be in furtherance of pump-and-dumps of the various Issuers' stock.  On January 16, 2019, Eddie Austin pleaded guilty in *United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.) to one count of conspiracy to commit wire in violation of 18 U.S.C. § 371.

5

14.     **Scott Russell Sieck** ("Sieck"), age 60, is a U.S. citizen residing in Winter Park, Florida.  Sieck is a former stockbroker who was permanently enjoined, by consent, in settlement of an SEC penny stock fraud enforcement action, from violating the antifraud and registration provisions of the federal securities laws.  *See SEC v. Scott R. Sieck et al.*, Civil Action No. 99-6165-CIV-Dimitroulas (S.D. Fla., filed Feb. 10, 1999).  In this pump-and-dump scheme, Sieck oversaw the Group's trading in the various Issuers' stock and, in doing so, among other things recruited and directed brokers to effect trades in the Issuers' stock for the Group's benefit.  Sieck also attended the Group's "war room" strategy meetings during which the "story arcs" for the various Issuers were formulated.  On January 14, 2019, Sieck pleaded guilty in *United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.) to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371.

15.     **Carolyn Price Austin** ("Carolyn Austin"), age 64, is a U.S. citizen currently residing in Houston, Texas.  She is married to Defendant Eddie Austin.  She has twice been permanently enjoined, by consent, in settlement of separate SEC penny stock fraud enforcement actions, the first enjoining future violations of the securities registration provisions, and the second adding a penny stock bar.  *See SEC v. Sunrise Solar Corporation et al.*, Civil Action No. 5:12-CV-918 (W.D. Tex., filed Sept. 28, 2012) and *SEC v. Farmer et al.*, Civil Action No. 4:14-cv-02345 (S.D. Tex., filed Aug. 14, 2014).  Her role in the scheme included attending the Group's "war room" strategy meetings at which the Group formulated promotional strategies concerning the various Issuers, and allowing the Group to open and to use, in furtherance of the scheme, accounts bearing her name.  On January 16, 2019, Carolyn Austin pleaded guilty in *United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.) to one count of misprision of a felony in violation of 18 U.S.C. § 4.

16.     **John David Brotherton** ("Brotherton"), age 59, is a U.S. citizen currently residing in a federal detention facility in Conroe, Texas, where he is awaiting sentencing in *United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.).  Brotherton participated in "war room" strategy meetings—during which he and others formulated the "story arcs" for the various Issuers—and coordinated promotions for the Group's pump-and-dumps through late 2013.  Brotherton later rejoined the Group's scheme during its Valmie pump-and-dump, in which he assisted in formulating promotional strategies and received distributions of illicit stock-sale proceeds.  On February 12, 2019, Brotherton pleaded guilty in *United States v. Farmer, et al.,* Crim. No. 4:16-CR-408 (S.D. Tex.) to one count of conspiracy to commit wire fraud in violation of 18 U.S.C. § 371.

## THE ISSUERS

17.     **Puget Technologies, Inc. ("Puget")** is a Nevada corporation headquartered, during the relevant period, first in Fort Lauderdale, Florida, and then in Englewood, Colorado. Puget was in the business of developing "innovative cannabinoid products and therapies" for the treatment of various diseases.  At all relevant times, Puget's securities were quoted on OTC Link under the symbol "PUGE."  Puget filed periodic reports, including Forms 10-K and 10-Q, with the Commission until September 23, 2015.  From June 2013 through May 2014, the Group (i) made an unregistered offering of 14.95 million shares of Puget's stock, comprising over 99.6% of the Company's unlegended shares, (ii) conducted a massive, materially misleading promotional campaign touting Puget, and (iii) dumped its artificially inflated shares of Puget stock into an unsuspecting market.  By so doing, the Group reaped, from its securities registration and securities fraud violations, at least $1.33 million in illicit Puget trading profits in May 2014 alone.

18.     **Gankit Corporation** ("**Gankit**") was a Nevada corporation headquartered in Houston, Texas that purportedly operated an online auction website.  At all relevant times, Gankit's securities were quoted on the OTC Link under the ticker symbol "GANK."  Gankit filed periodic reports, including Forms 10-K and 10-Q, with the Commission until April 11, 2014.  (On June 13, 2014, Gankit's name and ticker symbol were changed to Nhale, Inc. and NHLE, described below.)  From August 2013 through June 12, 2014, the Group (i) made an unregistered offering of as many as 5.8 million shares of Gankit's stock, comprising as much as 58% of the Company's unlegended shares, (ii) conducted a massive, materially misleading promotional campaign touting Gankit, and (iii) dumped its artificially inflated shares of Gankit stock into an unsuspecting market.  By so doing, the Group reaped, from its securities registration and securities fraud violations, at least $100,650 in illicit Gankit trading profits between May and mid-June 2014 alone.

19.     **Nhale, Inc.** ("**Nhale**"), the successor to Gankit (see above), was a Nevada corporation headquartered in Houston, Texas that purportedly engaged in the distribution of non-flame smoking devices and in the pursuit of marijuana legalization.  At all relevant times, Nhale's securities were quoted on the OTC Link under the ticker symbol "NHLE."  Nhale filed periodic reports, including Forms 10-K and 10-Q, with the Commission until January 13, 2017. From June 13, 2014 through at least January 7, 2015, the Group (i) made an unregistered offering of as many as 4.2 million shares of Nhale's stock, comprising as much as 42% of the Company's unlegended shares, (ii) conducted a massive, materially misleading promotional campaign touting Nhale, and (iii) dumped its artificially inflated shares of Nhale stock into an unsuspecting market.  By so doing, the Group reaped, from its securities registration and

securities fraud violations, at least $1.1 million in illicit Nhale trading profits between June 2014 and January 2015 alone.

20.     **Horizon Energy Corp.** ("**Horizon**") was a Wyoming corporation headquartered in Gulfport, Mississippi that purported to produce solar energy products and solutions.  At all relevant times, Horizon's securities were quoted on the OTC Link under the ticker symbol "HORI."  Horizon filed periodic reports, including Forms 10-K and 10-Q, with the Commission until November 12, 2014.  From June 19, 2013 through at least October 20, 2014, the Group (i) made an unregistered offering of as many as 5.229 million shares of Horizon's stock, comprising as much as 52.9% of the Company's unlegended shares, (ii) conducted a massive, materially misleading promotional campaign touting Horizon, and (iii) dumped its artificially inflated shares of Horizon stock into an unsuspecting market.  By so doing, the Group reaped, from its securities registration and securities fraud violations, at least $1.436 million in illicit Horizon trading profits between May and October 2014 alone.

21.     **Valmie Resources, Inc.**  ("**Valmie**") is a Nevada corporation with its principal place of business in Houston, Texas.  Originally incorporated in 2011, and quoted on OTC Link since December 2012, Valmie underwent several changes to its business plan before characterizing itself, beginning in January 2015, as a provider of unmanned aerial vehicle services, or "drones."  At all relevant times, Valmie's securities were quoted on the OTC Link under the ticker symbol "VMRI."  Valmie filed periodic reports, including Forms 10-K and 10-Q, with the Commission until April 13, 2017.  The Commission suspended trading in VMRI on May 4, 2017.  From May 2014 through May 3, 2017, the Group utilized fraudulent devices that included filing false registration statements, coordinating trading, and secretly funding promotional campaigns to reap at least $7.67 million in illicit Valmie trading profits.

## OTHER RELEVANT PERSONS AND ENTITIES

22.     **Black Diamond Media, Inc.** ("**Black Diamond**") was, at all relevant times a Texas corporation (incorporated in September 2016) with its principal place of business in Houston, Texas.  The Group used Black Diamond to arrange for and fund promotions of Valmie and receive distributions of Valmie stock sale proceeds.

23.     **Meridian Investment Group Inc.** ("**Meridian**") was, at all relevant times, a Wyoming corporation with its principal place of business in Oviedo, FL, and owned by Sieck. The Group used Meridian as a platform to effect matched and coordinated trading in, as well as sales of, the various stocks comprising the scheme in furtherance of each pump-and-dump's prime the pump and dump the stock phases.

24.     **Spot Marketing LLC** ("**Spot Marketing**") was, at all relevant times, a Wyoming corporation (incorporated in March 2012) with its principal place of business in Houston, Texas. The Group used Spot Marketing to arrange and fund promotions of the scheme's various stocks and to receive distributions of their trading proceeds.

## FACTS

**Defendants' Years-Long Pump-and-Dump Scheme**

25.     In 2011, Defendants Farmer, Eddie Austin, Sieck, and Brotherton formed their Group (the "Group"), which they dedicated to perpetrating serial, successive pump-and-dump frauds with U.S. penny stocks, with Carolyn Austin to share, with Eddie Austin, in the Group's profits.

26.     Throughout the next six years, Farmer, Sieck, and Eddie Austin were Partners in the Group, in that, on an informal and unaudited basis overseen by Farmer, each received approximately equivalent distributions of each pump-and-dump's net proceeds (except that

Eddie and Carolyn Austin together constituted a single Partner share).  Brotherton was a Partner in all of the Group's pump-and-dumps occurring during his Group participation, which was continuous until in or around late 2013, and that resumed by 2015, during the Group's Valmie pump-and-dump.  For purposes of various of its pump-and-dumps within the past five years, and typically with Eddie Austin's concurrence, Farmer also caused the Group to add an additional Partner or Partners.

27.     Between at least its formation in or about May 2011 and May 2017, the Group committed pump-and-dump frauds with penny stocks quoted for trading on U.S. markets.  Of these pump-and-dumps, the five involving the Issuers occurred, in whole or in part, within the most recent five years.

28.     In perpetrating the scheme, the Group carried out essentially the same steps with each Issuer's stock.  Each pump-and-dump fraud began with the Group acquiring control of a shell company either having, or that it soon outfitted with, what the Group considered to be an appealing-to-penny-stock-investors business plan, and over which it installed, as CEO, either a Group employee or a figurehead it recruited, whose activities the Group could, and did, direct. Each also involved a company with little to no genuine business or revenue that the Group nonetheless would aggressively promote as supposedly offering extremely lucrative prospects for buyers of its stock.  Each involved massive and profitable dumping of the stock by the Group, through its foreign and domestic front companies, into the price and volume rises its promotional campaigns triggered.  This dumping, in each case, also violated the registration provisions.  And in each, the investors the Group deceived were left holding virtually worthless paper after the Group's promotions ceased.

I.   **Phase One:  Getting the Stock (in both "unrestricted" and market-tradeable form)**

   A.  **Making A Sham Public Offering (Gankit/Nhale and Horizon)**

29.     In the case of three of the Issuers (Gankit, which became Nhale, and Horizon, which had started as Solar America), the Group effected a sham public offering, for the purpose of delivering purportedly free-trading stock to its *alter ego* front companies while, in fact, evading the securities registration provisions of the federal securities laws.  In orchestrating these sham offerings, the Group acted principally through Farmer and, in the case of Solar America/Horizon, through Eddie Austin as well.  For these Issuers, the sham offerings were the subject of S-1 registration statements filed with the Commission.

30.     Although Solar America's S-1 was filed on June 7, 2011 and became effective on March 29, 2012, the Group's distribution of Horizon shares in reliance on that S-1 continued into October 2014.

31.     Although Gankit's S-1 was filed on July 29, 2012 and became effective on November 28, 2012, the Group's distribution of Gankit and Nhale shares in reliance on that S-1 continued into January 2015.

32.     Both Solar America's S-1 and Gankit's S-1 purported to register a "self-underwritten, best-efforts" offering through which each company's CEO, without assistance from agents or other third parties, would attempt to sell the offered shares to *bona fide*, unaffiliated purchasers.  Each of these claims, however, was materially false and misleading because the offerings that actually occurred were drastically different from those described in the registration statements.

33.     In fact, the Group rigged both offerings in a manner designed to give the Group control of millions of shares of purportedly unrestricted stock while creating the false appearance

12

that *bona fide* purchasers, and not the Group, were the shares' buyers.  The Group did this by lining up straw purchasers, with the understanding that each would be afforded an opportunity in six months' time to remit the stock back to Farmer, or other Group personnel, for a 50% profit, and with the expectation (nearly always justified) that each straw purchaser would do so. Although each purchaser signed a subscription agreement and paid by check or wire, ostensibly evidencing a *bona fide* purchase, these transactions were not legitimate because of, among other things, the expectation that these purchasers would later sell their shares back to the Group.

34.     During the Solar America offering, for example, Eddie Austin emailed a relative on April 10, 2012, saying, in part:  "Hi ….  Another chance for you to make a 50% return within six months.  $10,000 investment.  Talk tomorrow.  Love ya."  This email included a forwarded message from Farmer saying in part, "Eddie, here is the subscription agreement for [your relative] to sign," and attaching a Solar America subscription agreement.  The relative promptly signed and returned the agreement, along with a $10,000 check (to subscribe for 500,000 Solar America shares), to Farmer's office.  Within four months, by August 15, 2012 (following a 3-for-1 stock split), certificates for 1.5 million Solar America shares had been issued in the relative's name.  On October 31, 2012, Farmer bought back these shares from the relative at the 50% return Eddie Austin had promised, using a $15,000 check drawn on one of the Group's domestic *alter ego* companies' account.

35.     Like Eddie Austin's relative, the vast majority of the purported purchasers of Solar America's offering likewise soon resold their shares to a Group *alter ego* entity.  In making these "sales," each did so at the very same share price, and on or about the same dates, as one another.  As a result of these transactions, virtually all the Solar America offering's shares were soon reconsolidated into share certificates issued in the names of the Group's foreign and

domestic *alter ego* entities, which, in the case of that offering, totaled nine in number.  As noted above, the Group's public sales of the shares that were reconsolidated continued into October 2014, by which time Solar America had become Horizon.

36.     Similarly, in the case of Gankit/Nhale, the Group lined up thirty-seven straw purchasers to purportedly fully subscribe to every last share in the Gankit offering.  By pre-arrangement, every single share so purchased was likewise reconsolidated into share certificates issued in the names of the Group's foreign and domestic *alter ego* entities, which, in the case of that offering, totaled six in number.  As noted above, the Group's public sales of the shares that were reconsolidated continued into January 2015, by which time Gankit had become Nhale.

37.     The above-described conduct gave the false impression of *bona fide* public offerings for both Solar America/Horizon and Gankit/Nhale, which, if genuine, would have made each's securities freely tradeable on the secondary market.  In reality, however, because the offerings were shams, Solar America/Horizon and Gankit/Nhale's stock remained restricted, and the Group's subsequent sales of that stock, which continued until October 2014 and January 2015, respectively, constituted unregistered offerings of securities in violation of the registration provisions of the federal securities laws.

**B. Filing Fraudulent Market-Quotation Applications (Gankit/Nhale and Horizon)**

38.     Also in the case of Gankit/Nhale and Horizon (which started as Solar America), the Group, acting principally through Farmer, orchestrated a materially false and misleading application to FINRA to have each company's shares quoted on the Over-the-Counter ("OTC") market (and thus readily tradeable by retail investors through their brokerage accounts).

39.     In particular, the Group arranged for these Issuers to engage a market maker to file a Form 211 with FINRA applying to have each Issuer's stock cleared for quotation on the

OTC.  A Form 211 calls for disclosure of certain detailed information about the issuer, which FINRA uses, along with any supplemental information supplied in response to its follow-up questions, to determine whether the issuer meets the relevant regulatory requirements.  With respect to Gankit/Nhale and Solar America/Horizon, the Group was able to obtain this clearance only by misleading FINRA into believing there was sufficient investor interest in each company's business to warrant its clearing each company's stock for such quotation.

40.     As additional groundwork for this second step, the Group, principally through taking steps devised during its "war room" strategy meetings, ensured that both companies sustained a nominal level of operations and filed audited financial statements and periodic reports.  This, together with the purported demonstrated interest and participation of individual investors in each company's registered offerings (34 such investors in Solar America's and 37 in Gankit's) created a façade lending to each the appearance of a legitimate startup company.

41.     Despite the fact that the Solar America/Horizon and Gankit/Nhale 211 Applications were, before being submitted by their market maker sponsor, reviewed and signed by each company's CEO, it was in fact the Group, acting primarily through Farmer, that either directed the 211 Application's preparation, or helped prepare or review it.  The same was true of both Issuers' responses to FINRA's follow-up questions during FINRA's review of the applications.

42.     In both cases, either the original application, or the responses to FINRA's follow-up questions, or both, included materially false and misleading representations.  Solar America/Horizon's 211 file, for example, included a false claim that "no past, present or future arrangement exists by which any person or entity would control … the sale, transfer, disposition … or any other aspect of the shares listed on the shareholder list other than the person or entity

identified as the shareholder."  As Farmer and his Partners in the Group well knew, however, the

Group in fact had arrangements in place with every person on the shareholder list that it expected

would result (and in virtually every case *did* result) in those persons' shares being reconsolidated

into the hands of the Group.  For its part, Gankit/Nhale's 211 File includes the false and

materially misleading claims that, among other things, the thirty-seven individuals who

purportedly purchased all the shares in Gankit's public offering had been drawn to the company

through one of their number's happening to come across the Company's website, and then

recruiting the others.

**C.  Obtaining "Free Trading" Shares (All Issuers)**

**a.  Solar America/Horizon and Gankit/Nhale**

43.     Because of the false appearance that Solar America's/Horizon's and

Gankit's/Nhale's stock had been issued in *bona fide* public offerings, and because the Group

concealed from the transfer agents (i) its direct role in the aforementioned public offerings and

(ii) its common ownership of all the foreign and domestic entities requesting cancellation and

reissuance of shares in these Issuers' stock, each transfer agent mistakenly concluded that each

Issuer's stock could be issued without restrictive legend.

44.     Shares issued without restrictive legend are immediately and freely tradeable.  But

shares obtained through a sham public offering orchestrated by persons controlling the Issuer, as

the Group's Solar America, Horizon, Gankit, and Nhale shares were obtained, were, and should

have been legended as, restricted.  That is because Securities Act Rule 144(a)(3)(i) provides that

"restricted securities means securities acquired directly or indirectly from the issuer, or from an

affiliate of the issuer, in a transaction or chain of transactions not involving any public offering."

45.     Thus, the Group caused each transfer agent to erroneously issue stock without restrictive legend for Solar America/Horizon and Gankit/Nhale, thereby allowing the stocks to be immediately and freely tradeable.

**b.  Puget and Valmie**

46.     The Group accomplished the same result in the case of Puget and Valmie as well, for in the case of both Issuers, the Group acquired *all* of their outstanding shares from an affiliate of the Issuer, that is, from a party that controlled the Issuer.  The Group then proceeded to obtain the cancellation of every share certificate it was able to obtain, and reissuance of those shares to various *alter ego* front companies it controlled, without disclosing to transfer agents its common ownership of those entities.

47.     By these means, the Group succeeded in having the transfer agents for all five Issuers' stocks issue share certificates bearing no restrictive legend to the Group's various foreign and domestic *alter ego* front companies.  This, in turn, enabled the Group to sell all five stocks to the public on the market while avoiding applicable registration requirements and trading restrictions.

**c.  Additional Machinations as to Valmie**

48.     In or about September 2014, authorities in Belize executed search and seizure warrants at certain locations in Belize, including a brokerage house holding millions of the Valmie shares that the Group had secretly acquired, as described above, from a party that had controlled Valmie.  In the aftermath of these seizures, the Group was unable to deposit and sell the aforementioned Valmie shares, as it had planned to do, through various of the Group's foreign and domestic entities.

49.     To redress its shortfall of Valmie shares, the Group proceeded to cause Valmie to issue millions of additional shares, through a combination of debt offerings and private placements, to various of the Group's foreign and domestic *alter ego* entities.  Acting primarily through Farmer, the Group caused Valmie to file with the Commission materially false and misleading registration statements on Form S-1 concerning these offerings, which characterized the various Group entities receiving Valmie shares in these offerings as "selling shareholders."

50.     In particular, these registration statements falsely claimed that an array of different, specific individuals exercised "sole voting and investment power" over the Valmie shares issued to each entity, and, further, that none of the various entities receiving shares in these offerings were affiliated with each other.  In fact, however, as Farmer and the Group's other leaders well knew, each entity was *de facto* controlled by the Group, and all were intimately affiliated with each other, as Group *alter ego* entities whose holdings and trading were under the Group's common control at all times.  Thus, here again, the transactions registered were not the transactions that actually occurred; and all the shares issued in the private offerings were in fact issued to affiliates of the Company and remained restricted and subject to the holding periods and volume limitations set forth in Securities Act Rule 144.  Accordingly, the Group's subsequent offers and sales of millions of shares of Valmie stock were, in fact, unregistered offerings that did not comply with Rule 144's strictures.

51.     The part of the scheme detailed heretofore subverted the SEC registration process because, in the case of all five Issuers, the stock the Group obtained, through the means described above, should have been restricted.  Accordingly, the Group's subsequent sales of all five Issuers' stock, so obtained, violated the registration provisions.

## II.   Phase Two:  Priming the Pump

52.   The next step in each of the Group's five pump-and-dumps detailed herein was to "prime the pump" by orchestrating matched or otherwise coordinated trades (in which both buyer and seller are secretly in league, working together to create the illusion of market demand and to set artificially elevated prices).  The purpose of this activity was to create the artificial appearance of real market interest in each Issuer's stock, and to set artificially elevated share prices from which the Group could launch its promotional campaigns for each Issuer's stock.

53.   To carry out this stage, the Group's Partners and employees shared with one another (with the respective account-holder's authorization) the user names and passwords to facilitate access, online, to the brokerage accounts of the Group's various *alter ego* front companies.  Several of the Group's Partners and employees, including Farmer and Sieck, also opened individual accounts in their own names at discount brokerage firms, which they could—and did—use for one side of matched or coordinated trades in the various pumped-and-dumped Issuers.

54.   Sieck's primary role in the Group was to oversee its trading activity.  To carry out this role, Sieck, among other things, lined up a group of traders, including several working from his Meridian entity's warehouse, to log in to many of the Group's various *alter ego* front companies' brokerage accounts and effect the trading.

## III.   Phase Three:  Pumping the Stock

## A.   Formulating Materially Misleading "Story Arcs"

55.   As part of their pump-and-dump scheme, the Group created, for each of the five Issuers, what the Defendants referred to as "story arcs" (or "story boards" or "press arcs").  Each story arc set forth each Issuer's supposed line of business and a detailed timeline for when press

releases would be disseminated.  The Group met in person to discuss potential story arcs, often in the Group's Houston, Texas "war room," which was a windowless conference room, as well as in other locations, such as the Bahamas and Las Vegas, Nevada.

56.     The Group, which controlled each Issuer, also took the minimal steps necessary to lend some superficial credence to the story arcs' characterizations of each Issuer's business. This included ensuring each Issuer had some level of operations or assets within its purported line of business, and that each had the minimum level of funding necessary to continue operating long enough for the Group to unload the Issuer's stock.  The Group's efforts were never oriented toward any of the Issuers achieving genuine industrial or commercial success.

57.     Farmer, the Austins and Sieck all attended or participated in some or all of these strategy meetings, as did Brotherton, except during his hiatus from the Group.

58.     The story arcs' features included pre-planned press releases, often non-substantive, exaggerated, or both, that would be timed to coincide with promotional campaigns, as discussed below, in order to artificially increase the profiles of the companies and the volume and price of the shares.

**B.  Launching Promotional Campaigns**

59.     The next step in each of the five Issuers' pump-and-dumps was the Group's design, coordination, and disguised funding of massive, materially misleading promotional campaigns urging investors to buy the stock in question.  These campaigns, which accorded with the fraudulent "story arcs" the Group had created, typically included both online banner-ad (also known as "click ad") and email-blast components, and were timed to coincide with Issuer press releases.  Because it controlled each Issuer, the Group was able to direct these releases' content and dissemination schedule.

60.     The promotions were typically materially misleading in claiming each Issuer was poised to generate commercial success leading to profitable returns for purchasers of its stock. In fact, however, as all the Defendants well knew, none of the Issuers had any genuine prospect of any such success, for the reasons stated at paragraph 56 above.  Such materially misleading claims included:

 a. Assertions in a May 7, 2015 blast email from an online newsletter called *The Street Alert* that Valmie "is an amazing Drone Technology Company which has become the talk of the Street lately" and "is ready to move!";

 b. Assertions in a September 29, 2014 blast email from an online newsletter called *Small Cap Crowd* that Nhale "develops and sells leading edge grow technology in the marijuana space ready for rapid commercialization" and that "Nhale is growing fast and working hard to ensure maximum returns for each of its shareholders";

 c.  Assertions in April 28, 2014 "click ads" that Puget was "Poised For Huge Growth!  Invest Now!" and was "Becoming a Major Player in Booming Market.  Invest in PUGE Now"; and

 d. Assertions in August 4, 2014 and April 30, 2014 "click ads," respectively, that Horizon was "Helping Revitalize American Oilfields" and was "Poised For Huge Growth.  Invest Today!".

61.     The promotions' disclaimers also included materially misleading statements claiming that "a non-affiliate third party" had paid for them, when, in fact, the Group paid for the promotions for all five of the Issuers.  The Defendants facilitated these materially misleading statements by routing their funding of the promotions through various third parties.  For example

21

(i) the Valmie email blast from *The Street Alert*, referenced above, included the claim that the newsletter had "received a total of $15,000 from a non affiliate third party[, Media Company A]" for disseminating the blast and (ii) the Nhale *Small Cap Crowd* email blast, referenced above, included the claim that the newsletter had "been compensated up to two thousand dollars for the marketing awareness budgeting efforts on NHLE via wire/transfer by an unrelated third party, [Media Company B]."  In fact, however, in both cases, one of the Group's domestic *alter ego* entities had paid for the promotion, and had those funds routed through two intermediary entities to obscure their origin.  In other cases, the Group drew upon other funding sources available to it. These included using various of the Defendants' American Express cards, and then reimbursing them from Group *alter ego* entities' accounts.

62.     All the Defendants materially contributed to the Group's promotional efforts concerning the Issuers.

63.     Between 2014 and 2017, Spot Marketing and Black Diamond Media entities were the primary vehicles through which the Group coordinated promotions of the Issuers' stock.  All the Defendants contributed to funding these promotional campaigns during this period, whether through applying portions of their stock sale profits, or making payments using their American Express cards, or otherwise.

**IV.  Phase Four:  Dumping the Stock**

**A.  Selling the Stock, After Artificially Driving Up Price and Volume**

64.     In each of its pump-and-dump frauds, the Group's materially misleading promotional efforts resulted in increases to each stock's share price and trading volume, which the Group exploited by massively dumping, i.e. selling, its shares into those rises.  This dumping

typically took place simultaneously through the Group's various *alter ego* accounts, both foreign and domestic.

65.     This selling, like that in the "prime the pump" phase described above, was overseen by Sieck, with the knowledge of the other Defendants.

**B.  Distributing the Ill-Gotten Proceeds of the Scheme**

66.     The next step in each of the Group's pump-and-dump frauds was to distribute the proceeds of each fraud.

67.     Farmer oversaw these distributions, determining the amounts, net of expenses, to be distributed to each of the Group's Partners.    These distributions were generally made in accordance with the predetermined "Partner" shares, described above.

68.     The distributions were typically made in circuitous or disguised fashion.  For example, portions of the Austins' Partner share were sometimes delivered via a third party, or via wire transfer to a casino designated by Eddie Austin, or otherwise.

69.     As another example, at least $250,000 of Brotherton's share of Valmie proceeds was dispensed to him via wire, in October 2016, from one of the Group's foreign *alter ego* front companies to a purported startup company that Brotherton controlled.  This distribution was misleadingly papered as an investment in that company.

**C.  Adjusting the Group's Front Company Portfolio**

70.     At various points in time during the course of its scheme, including within the most recent five years, the Group made adjustments to its portfolio of foreign and domestic *alter ego* front companies.

71.     These adjustments included, among other things, retiring some front companies, creating others, and, in so doing, enlisting or otherwise obtaining the use of new nominees as these front companies' supposed owners.

72.     The aforementioned machinations had the intended effect of rendering the Group's activities more challenging to detect and to quantify.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### [Securities Fraud]

### Violations of Securities Act Section 17(a)
### [Against All Defendants]

73.     Paragraphs 1 through 72 are realleged and incorporated herein by reference.

74.     As described above, Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin and Brotherton, acting knowingly, recklessly, and negligently, in the offer or sale of one or more of Puget, Gankit, Nhale, Horizon, and Valmie securities, by use of the means or instruments of transportation or communication in interstate commerce or of the mails, directly or indirectly:

    a.   employed devices, schemes, or artifices to defraud;

    b.   obtained money or property by means of untrue statements of material facts or omissions of material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

    c.   engaged in transactions, practices, or courses of business which operated or would have operated as a fraud or deceit upon the purchasers of Puget, Gankit, Nhale, Horizon, and/or Valmie securities.

75.     By engaging in the foregoing conduct, Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

### SECOND CLAIM
### [Securities Fraud]

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### [Against All Defendants]

76.     Paragraphs 1 through 72 are realleged and incorporated herein by reference.

77.     As described above, Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, acting knowingly or recklessly, directly or indirectly, in connection with the purchase or sale of one or more of Puget, Gankit, Nhale, Horizon, and Valmie securities, by use of the means or instrumentalities of interstate commerce, or of the mails, or of any facility of a national exchange:

   a.   employed devices, schemes, or artifices to defraud;

   b.   made untrue statements of material facts or omitted to state material facts necessary to make the statements made, in the light of the circumstances under which they were made, not misleading; or

   c.   engaged in acts, practices, or courses of business which operated or would have operated as a fraud or deceit upon any person.

78.     By engaging in the foregoing conduct, Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**THIRD CLAIM**
**[Unregistered Offering of Securities]**

**Violations of Securities Act Sections 5(a) and 5(c)**
**[Against All Defendants]**

79.     Paragraphs 1 through 72 are realleged and incorporated herein by reference.

80.     At all relevant times, the Puget, Gankit, Nhale, Horizon, and Valmie shares

referenced above as having been offered and sold by Defendants Farmer, Eddie Austin, Sieck,

Carolyn Austin, and Brotherton were not registered in accordance with the provisions of the

Securities Act and no exemption from registration was applicable.

81.     Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton's offers

and sales of one or more Puget, Gankit, Nhale, Horizon, and Valmie shares were made in the

United States in that: (a) sales were executed by broker-dealers firms in the United States;

(b) irrevocable liability with respect to sales was incurred in the United States; and (c) title with

respect to the sales passed in the United States.

82.     By reason of the foregoing, Defendants Farmer, Eddie Austin, Sieck, Carolyn

Austin, and Brotherton, directly or indirectly, made use of the means and instruments of

transportation or communication in interstate commerce, or of the mails, to offer and sell

securities when no registration statement had been filed or was in effect as to such securities, and

when no exemption from registration was available.

83.     By reason of the foregoing, Defendants Farmer, Eddie Austin, Sieck, Carolyn

Austin, and Brotherton, violated and, unless restrained and enjoined will continue to violate,

Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and (c)].

## PRAYER FOR RELIEF

**WHEREFORE,** the Commission respectfully requests that this Court enter a Judgment that:

(i)     permanently enjoins Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, from:

    a.   violating Securities Act Section 17(a) [15 U.S.C. § 77q(a)];

    b.   violating Exchange Act Section 10(b) [15 U.S.C. §§ 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. §§ 240.10b-5];

    c.   violating Securities Act Section 5 [15 U.S.C. §§ 77e]; and

    d.   directly or indirectly, including but not limited to, through any entity each owns or controls, engaging in any activity for the purpose of inducing or attempting to induce the purchase or sale of any security, causing any person or entity to engage in any activity for the purpose of inducing or attempting to induce the purchase or sale of any security, or deriving compensation from any activity engaged in for the purpose of inducing or attempting to induce the purchase or sale of any security, provided, however, that such injunction shall not prevent each from purchasing or selling securities listed on a national securities exchange for an account that is in each's own name;

(ii)    permanently bars Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, from:

    a.   participating in an offering of penny stock; and

    b.   acting as an officer or director of any public company pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. §78u(d)(2)];

(iii)    orders Defendants Farmer, Eddie Austin, Sieck, Carolyn Austin, and Brotherton, to pay civil penalties pursuant to Securities Act Section 20(d) [15 U.S.C. § 77t(d)] and Exchange Act Section 21(d)(3) [15 U.S.C. § 78u(d)(3)] for all violative conduct occurring within five years of the filing of this Complaint;

(iv)    orders Defendants Farmer, Sieck, and Brotherton, to disgorge, with prejudgment interest, and orders Defendants Eddie and Carolyn Austin, jointly and severally, to disgorge, with prejudgment interest, any and all ill-gotten gains each received as a result of the conduct described herein within five years of the filing of this Complaint; and

(v)    grants such other relief as the Court deems just or appropriate.

Dated:  May 15, 2019                    Respectfully submitted,

                                         *s/ Matthew J. Gulde*
                                        Matthew J. Gulde
                                        Illinois Bar No. 6272325
                                        S.D. Texas Bar No. 1821299
                                        U.S. Securities and Exchange Commission
                                        Fort Worth Regional Office
                                        Burnett Plaza, Suite 1900
                                        801 Cherry Street, Unit #18
                                        Fort Worth, TX 76102-6882
                                        (817) 978-1410 (mg)
                                        (817) 978-4927 (facsimile)

                                        *s/ Joshua E. Braunstein*
                                        Joshua E. Braunstein
                                        Maryland  Bar No. 9412130082 (motion for
                                        admission *pro hac vice* pending)
                                        U.S. Securities and Exchange Commission

28

100 F Street, NE
Washington, DC 20549
BraunsteinJ@sec.gov
(202) 551-8470

**ATTORNEYS FOR PLAINTIFF**
**SECURITIES AND EXCHANGE COMMISSION**

Of Counsel:
J. Lee Buck II
Christopher R. Mathews
Kelly V. Silverman
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549